UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE TOASTED OAT, INC.,

    Plaintiff,

v.

SNACKWERKS OF MICHIGAN, LLC,

    Defendant.
_____/

Case No. 1:21-cv-374

Hon. Hala Y. Jarbou

## OPINION

This is a diversity action claiming breach of contract, breach of express warranties, and negligence. Plaintiff The Toasted Oat, Inc. ("TTO") contracted Defendant Snackwerks of Michigan, LLC, to manufacture its granola products. To produce this granola, Snackwerks sourced ground golden flaxseed from JJ Nuts, LLC. According to TTO's second amended complaint, some of this flaxseed contained mold and yeast, contaminating two production runs of TTO's granola products in 2020. After receiving customer complaints about its granola and identifying the source of the problem, TTO recalled those products in March 2021. This lawsuit followed. Before the Court are Snackwerks's motion to dismiss TTO's negligence claim (ECF No. 42) and Snackwerks's motion for partial summary judgment (ECF No. 58). For the reasons herein, the Court will grant both motions.

## I. BACKGROUND

TTO sold soft-baked granola products under its own brand name (the "Products"). Snackwerks manufactures snacks for food companies. In July 2018, TTO and Snackwerks entered into a Manufacturing Services Agreement ("MSA"), in which Snackwerks agreed to "manufacture, package, store, and load" the Products for TTO. (*See* MSA § 1(a), ECF No. 59-1.)

In 2019, Snackwerks allegedly selected JJ Nuts to supply ground golden flaxseed, one of the ingredients in the Products. After TTO received customer complaints about "rancid, acid-like, chemical, soap-like taste" from customers who had purchased TTO's "Soft Granola Pouches and Soft Granola Crumble Bars," TTO investigated the issue and determined that the problem arose in two "production runs" by Snackwerks in 2020 ("Final 2020 Production Runs"). (2d Am. Compl. ¶ 12, ECF No. 33.)

Further investigation allegedly revealed that the source of the problem was flaxseed supplied by JJ Nuts that contained high levels of mold and yeast. (*Id.* ¶ 13.) In March 2021, Snackwerks's Managing Member, Jeff Grogg, told TTO's President and CEO, Erika Boll, that Snackwerks had received several wet and moldy pallets of flaxseed from JJ Nuts. (*Id.* ¶ 14.) In addition, Snackwerks's General Manager allegedly told TTO that Snackwerks had been aware of this issue before the Final 2020 Production Runs; Snackwerks allegedly attempted to address the issue by "using only flaxseed positioned around the perimeter of the pallet which showed no visible signs of mold[.]" (*Id.* ¶ 14.)

Before discovering this problem with the Final 2020 Production Runs, TTO entered into a "Letter of Interest" with Oppenheimer Companies, Inc., pursuant to which Oppenheimer would purchase the business and assets of TTO for a "substantial sum." (*Id.* ¶ 15.) While working to complete the sale, Oppenheimer allegedly provided TTO "interim purchase money financing" under a promissory note to enable TTO to have Snackwerks complete an "early 2021 production run" of TTO's products. (*Id.*)

On March 3, 2021, after learning of concerns about the mold contamination in TTO's products, Oppenheimer terminated its commitment to purchase TTO's business.

On March 15, 2021, TTO issued a "national FDA recall" of its products from the Final 2020 Production Runs. (*Id.* ¶ 17.) Because of the recall, TTO's reputation and business suffered and never recovered. It ceased operations.

Based on the foregoing, TTO asserts three claims against Snackwerks. First, it contends that Snackwerks breached its obligations under the MSA by producing "contaminated, adulterated products" for TTO. (*Id.* ¶ 36.)

Second, TTO claims that Snackwerks breached express warranties in the MSA regarding Snackwerks's manufacturing processes and the quality of the granola products produced for TTO.

Third, TTO claims that Snackwerks was negligent in that it breached its duties as a manufacturer to, among other things, produce products that were uncontaminated and safe for human consumption, use manufacturing processes that complied with food safety programs and standards, and inspect the products to make sure that they were safe, uncontaminated, and saleable.

TTO seeks damages for the following: the cost of producing the recalled products; lost profits from the recalled products; lost profits from canceled customer orders after the recall; expenses for investigating the contamination and effectuating the recall; damage to its brand reputation; lost proceeds from the termination of the transaction with Oppenheimer; legal expenses related to the Oppenheimer transaction; and the "[f]ull shut down and dissolution of [TTO] and its business due to the overall financial impact of the national FDA recall." (*Id.* ¶ 37.)

## II. DISMISSAL STANDARD

Snackwerks moves for dismissal of the negligence claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A claim may be dismissed if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and

3

conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. SUMMARY JUDGMENT STANDARD

Snackwerks also moves for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Specifically, Snackwerks contends that TTO is not entitled to damages related to the Oppenheimer transaction. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013). The Court must determine "whether the evidence presents

4

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## IV. ANALYSIS

### A. Negligence

Snackwerks argues that TTO's negligence claim is barred by the "economic loss doctrine." That doctrine, "simply stated, provides that '"[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses."'" *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992) (quoting *Kershaw Cnty. Bd. of Ed. v. U.S. Gypsum Co.*, 396 S.E.2d 369, 371 (S.C. 1990)).

> This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.

*Id.* "This distinction stems from the separate and sometimes conflicting purposes of tort and contract law[.]" *Id.*

> "Generally speaking, tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement."

*Id.* at 616 (quoting *Spring Motors Distribs., Inc. v. Ford Motor Co.*, 489 A.2d 660, 672 (N.J. 1985)). Consequently, "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the [Uniform Commercial Code.]" *Id.* at 618. Here, Snackwerks argues that the MSA is a contract for goods; thus, the UCC applies and TTO cannot seek a separate tort remedy.

5

Snackwerks also argues that TTO cannot state a negligence claim because that claim does not arise from a duty distinct from the MSA. Before *Neibarger*, Michigan courts held that "'there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract.'" *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 657 (Mich. 1997) (quoting *Hart v. Ludwig*, 79 N.W.2d 895, 897 (Mich. 1956)). Although there is a common law duty to "use ordinary care to avoid physical harm to foreseeable persons and property," that duty "'does not extend to intangible economic losses'" of the sort arising from a breach of contract. *Rochester Endoscopy & Surgery Ctr., LLC v. Desrosiers Architects, PC*, No. 349952, 2020 WL 6231823, at *4 (Mich. Ct. App. Oct. 22, 2020) (quoting *Rinaldo's Constr.*, 559 N.W.2d at 658). Accordingly, where parties to a tort action are also parties to a contract, a plaintiff in such an action cannot recover damages under a tort claim asserting negligence unless the plaintiff relies upon a duty "'separate and distinct from the contractual obligation[.]'" *Seltz v. Ford Motor Co.*, No. 341600, 2019 WL 5783344, at *6 (Mich. Ct. App. Nov. 5, 2019) (quoting *Sherman v. Sea Ray Boats, Inc.*, 649 N.W.2d 783, 789 (Mich. Ct. App. 2002)). "This concept applies independent of the economic loss doctrine." *George v. McGee*, No. 347636, 2020 WL 862814, at *3 (Mich. Ct. App. Feb. 20, 2020); *see Citizens Ins. Co. of Am. v. Pro. Temperature Heating & Air Conditioning, Inc.*, No. 300524, 2012 WL 5290289, at *5 (Mich. Ct. App. Oct. 5, 2012) (dismissing negligence claim because the defendant did not breach "a duty that existed separate and distinct from the defendant's contractual duties" under a services agreement).

### 1. Goods or Services

Although the MSA is titled a "services agreement," Snackwerks argues that the MSA was predominantly an agreement for the manufacture and delivery of goods, to which the UCC applies.[1] When a contract involves the provision of both goods and services, the Court looks at whether the contract "was *predominantly* one for services, rather than a transaction of goods." *Higgins v. Lauritzen*, 530 N.W.2d 171, 173 (Mich. Ct. App. 1995) (emphasis added). As explained by the Michigan Supreme Court:

> It is difficult to imagine a commercial product which does not require some type of service prior to its purchase, whether design, assembly, installation, or manufacture. If a purchaser were able to avoid the UCC by pleading negligent execution of one of the services required to produce the product, Article 2 could be easily and effectively negated. *A court faced with this issue should examine the purpose of the dealings between the parties.* If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required. Conversely, if the purchaser's ultimate goal is to procure a service, the contract is not governed by the UCC, even though goods are incidentally required in the provision of this service.

*Neibarger*, 486 N.W.2d at 622 (emphasis added). Where, as here, there is no genuine dispute about the terms of the contract, the Court can decide the issue as a matter of law. *Higgins*, 530 N.W.2d at 173.

Some "[f]actors relevant to the predominant purpose inquiry include [the] language of the parties' agreements, the circumstances surrounding their execution, and the allocation between costs of materials and services and the relative cost of goods to the total contract prices." *Allmand Assocs., Inc. v. Hercules Inc.*, 960 F. Supp. 1216, 1223 (E.D. Mich. 1997) (citations omitted).

In this case, the title of the MSA refers to services, but its contents reveal that its ultimate purpose was for Snackwerks to deliver a granola product to TTO. As indicated in the recital of

---

[1] The Court can consider the MSA on a motion to dismiss because it is central to TTO's claims.

the MSA, the MSA requires Snackwerks "to manufacture, package, store, and load" such products for delivery to TTO. (MSA, PageID.473.) In other words, the services provided by Snackwerks (manufacturing, packaging, storing, and loading) are incidental to the provision of the granola product.

In a similar case, *Lake & Piepkow Farms v. Purina Mills, Inc.*, 955 F. Supp. 791 (W.D. Mich. 1997), the plaintiff purchased a "custom blend of feed" from the defendant. *Id.* at 794. Although the defendant "had to assess the needs of Plaintiff's dairy cattle and design a custom blend of feed," the purpose of the contract was to provide a good. *Id.* Among other things, the court noted that the contract "did not charge separately for the assessment and design of the feed; it only charged for the feed itself." *Id.* Similarly, although TTO contends that it hired Snackwerks to use its "special skill and expertise to adequately screen, manufacture, and package plaintiff's product" (Pl.'s Resp. Br. 5, ECF No. 59), Snackwerks notes that the MSA does not separately charge for those services. Instead, it combines "all direct and indirect manufacturing, labor and overhead charges" into a "per unit rate." (MSA § 3(a)(i).)

The opinion in *Wells v. 10-X Manufacturing Co.*, 609 F.2d 248 (6th Cir. 1979), which involved facts like those in this case, provides helpful guidance. As here, the plaintiff in *Wells* contracted with a manufacturer to make a custom product. There, the product was a "chamois cloth hunting shirt." *Id.* at 251. The plaintiff designed the shirt and created its specifications. The plaintiff also acquired the materials necessary to make it and sent them to 10-X, the manufacturer. *See id.* 10-X produced only 78 shirts, none of which met the plaintiff's standards. The shirts "deviated in numerous instances from the tolerances agreed upon by the parties," revealing a "consistent pattern of inferior workmanship." *Id.* at 253. Consequently, the plaintiff decided to halt further production and sued 10-X for breach of contract.

8

The district court had to decide whether the UCC applied, so it examined whether the contract was predominantly one for goods or for services.  The district court decided that it was predominantly a contract for goods, but the Court of Appeals disagreed, reasoning as follows:

> Irrespective of the fact that performance under the terms of the contract would have resulted in the special manufacture of goods, the contract was one for the rendition of services. The language used in the contract clearly bespeaks the intention of the parties that 10-X's obligation under the contract was essentially to provide the manpower and machine capabilities for production of the hunting shirt. That *the only material supplied by 10-X in the entire production process was thread* is a factor to be considered in characterizing the contract one for services rather than goods. Finally, we note that the *parties are in litigation not on a claim of defective goods, but due rather to a deficient performance of services* by 10-X. Viewing the contract in the totality of the circumstances, we conclude it is correctly characterized as a contract for the rendition of services, to which the Code is not applicable.

*Id.* at 255 (emphasis added).

*Wells* is distinguishable.  Unlike the contract in that case, the MSA put the responsibility on Snackwerks to "procure[] all ingredients and supplies, other than product packaging[.]"  (MSA § 1(b).)

> Ingredients specific to the Products in an Order (the "Ingredients") shall be ordered and paid for by Manufacturer following Manufacturer's receipt of the Order. Manufacturer shall purchase the Ingredients for the Order. Manufacturer shall invoice Customer at the Standard Usage Rates at Manufacturer's actual cost for such Ingredients after Manufacturer's issuance of purchase order(s) therefor. . . .

(MSA § 3(a)(ii).)   Thus, Snackwerks was not simply providing "manpower and machine capabilities"; it was providing the components of the Product itself.[2]  The plaintiff's provision of the raw materials to the manufacturer was an important factor in *Wells*, and the Michigan Court of Appeals has cited that factor as well.  *See Crawford Cnty. Rd. Comm'n v. Carrick Gravel & Crushing*, No. 203099, 1999 WL 33329336, at *2 (Mich. Ct. App. Dec. 3, 1999) (contract for

---

[2] TTO contends in its brief that it purchased the flaxseed used by JJ Nuts, but it provides no support for this statement. In contrast, it alleges in its complaint that "All purchase orders given to JJ Nuts were issued *by Snackwerks*, and all payments made to JJ Nuts were made *by Snackwerks*."  (2d Am. Compl. ¶ 11 (emphasis added).)

9

gravel was a services contract because the plaintiff "essentially provided all the necessary materials for creating [it]"); *Thunder Bay Mfg. Corp. v. Detroit Edge Tool Co.*, No. 174785, 1996 WL 33323963, at *2 (Mich. Ct. App. July 9, 1996) ("Here, unlike the transaction in [*Wells*], plaintiff did not provide defendant with the raw material, and the contract did not indicate a contract for services.").

In addition, *Wells* is distinguishable because TTO's damages arise from a defect in the product manufactured by Snackwerks. TTO asserts that it lost profits and suffered damage to its reputation due to contamination of the Product. It also incurred expenses to recall the contaminated Product. Although Snackwerks's allegedly deficient practices caused the defect, TTO's damages are tied to the defective condition of the Product itself. (*See* 2d Am. Compl. ¶¶ 26-27 ("Snackwerks had an obligation to provide [TTO] with a product that did not contain contaminated, adulterated ingredients, and it failed to meet this obligation. . . . [TTO] suffered significant damages resulting from the national FDA product recall necessitated by the contamination . . . .").) Accordingly, the Court concludes that the MSA is predominantly a contract for goods rather than services.

TTO relies on Snackwerks's website, which indicates that Snackwerks provides manufacturing services. However, the Court looks first at the parties' agreement to determine its nature. And in any case, there is no dispute that Snackwerks provided some services to TTO. The question, however, is whether the services or the goods predominated in their contract. The Court concludes that the provision of goods was the predominant purpose. Consequently, the UCC applies and the economic loss doctrine bars TTO's negligence claim.

### 2. Separate and Distinct Duty

Even if the UCC does not apply, TTO fails to state a negligence claim because that claim is essentially identical to its breach-of-contract claim. It does not arise from a duty that is separate

10

and distinct from Snackwerks's obligations in the contract. For instance, in its negligence claim, TTO alleges that Snackwerks had the following duties: "to manufacture quality products in compliance with all food safety programs and standards"; "to produce non-contaminated, non-adulterated products safe for human consumption in compliance with state and federal standards and to not use contaminated, adulterated ingredients from third parties and fail to comply with state and federal standards"; "to inspect, test, evaluate and determine that [TTO's] products met all standards under state and federal law and were safe for human consumption[.]" (2d Am. Compl. ¶¶ 44-49.)

Similarly, in its breach-of-contract claim, TTO alleges that Snackwerks

> failed to have adequate quality control processes and procedures to ensure that the ingredients were not contaminated or adulterated, in compliance with federal and state standards, and safe for consumption, in accordance with the MSA.

(*Id.* ¶ 36.) In other words, the breach-of-contract claim and the negligence claim arise from the same duty: to provide TTO with an uncontaminated, unadulterated food product that was safe for human consumption and that complied with federal and state standards.

In its response to the motion to dismiss, TTO simply asserts that it anticipates that it may be able to show that Snackwerks committed a "misfeasance" in addition to negligence. (Pl.'s Resp. Br. 6, ECF No. 69.) TTO does not identify a duty separate and distinct from the MSA that would support a negligence claim. Accordingly, for all the foregoing reasons, the Court will dismiss that claim.

### B. Damages

TTO seeks damages for expenses and losses associated with the Oppenheimer transaction. Specifically, it seeks damages for "[t]ermination of the Oppenheimer transaction and loss of the substantial expected proceeds from that transaction" in the amount of $10,043,600. (2d Am. Compl. ¶ 37; Pl.'s Initial Disclosures 5, ECF No. 58-3.) It also seeks damages for "[l]egal fees

related to the Oppenheimer transaction incurred up to the time the transaction was terminated" in the amount of $20,000. (*Id.*)

In its motion for partial summary judgment, Snackwerks argues that it cannot be liable for damages associated with the termination of the Oppenheimer transaction because those damages were not contemplated by the parties in July 2018, when the parties entered into the MSA. Indeed, TTO asserts in an answer to an interrogatory that Snackwerks attended a meeting to discuss the potential acquisition of TTO by Oppenheimer in January 2021. (*See* TTO's Answers to Interrogs., ECF No. 58-1, PageID.446.) Yet the conduct by Snackwerks that allegedly resulted in contaminated Products occurred before that time. The Final Production Runs were in October and November of 2020. (Grogg Decl. ¶ 3, ECF No. 58-2.)

TTO does not dispute these facts. Instead, it relies upon an affidavit by Boll, who avers that both parties "contemplated that [they] would grow TTO's brand and reputation for a future equity purchase and/or acquisition of TTO." (Boll Decl. ¶ 9, ECF No. 29-2.) For this reason, Boll contends, the parties expressly incorporated the following assignability clause in the MSA that allows for a "change in control" of TTO (*id.*):

> *Assignability*: This Agreement shall be binding upon and be for the benefit of the Parties and their legal representatives, successors, and assigns. Neither Party may assign this Agreement without the prior written consent of the other Party.

(MSA § 12(f).) According to William Madden, an "expert" in the food industry, this is a "standard provision utilized in the food industry for anticipated and/or contemplated acquisitions." (Madden Decl. ¶ 6, ECF No. 79-3.)

TTO also contends that Grogg, Snackwerks's Managing Member, has extensive experience in the venture capital side of the food industry. He is a partner in a venture capital fund and an owner of a consulting firm, JPG Resources, that "helps small brands with . . . mergers and acquisitions of smaller scale food and beverage organizations." (*Id.* ¶¶ 11-12.) In fact, Grogg was

a founder of Brandjectory, a "platform for brands to find investor capital" that "featured" TTO on its website. (*Id.* ¶ 8.) Lucinda Wright, a former employee of JPG Resources, avers that she recalls meeting with Grogg and Boll *before 2016* "to discuss TTO's initial pitch deck which is routinely used during capital raises." (Wright Decl. ¶ 4, ECF No. 79-5.)[3] Thus, TTO contends that Snackwerks was aware, at the time of contracting, that TTO was "being built with the intent to be sold to another company." (Pl.'s Resp. Br. 4, ECF No. 97.) Alternatively, TTO argues that the Oppenheimer transaction is relevant as evidence of the value of TTO's business.

The Michigan Supreme Court has explained that damages recoverable for breach of contract are "those . . . that arise naturally from the breach, or which can reasonably be said to have been in contemplation of the parties at the time the contract was made." *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980). Michigan courts have applied "a flexible approach when determining the foreseeability of contract damages." *Lawrence v. Will Darrah & Assocs., Inc.*, 516 N.W.2d 43, 47 (Mich. 1994). "Consequential damages have been awarded when the loss resulted directly from the nonperformance of the contract between the parties, but not from the failure of another venture unknown to the defendant." *Kennedy v. Auto Owners Ins. Co.*, No. 294955, 2011 WL 3366364, at *3 (Mich. Ct. App. Aug. 4, 2011). "Unless the parties are both aware that a breach will affect a specific collateral enterprise, it cannot be said that the loss of profits from the other venture is within the contemplation of the parties." *Parmet Homes, Inc. v. Republic Ins. Co.*, 314 N.W.2d 453, 458 (Mich. Ct. App. 1981).

Here, there is no genuine dispute that Snackwerks was not aware of the Oppenheimer transaction when it entered into the MSA or when it accepted the orders that led to the Final 2020

---

[3] Wright's statement is supported by TTO's supplemental evidence, which includes email correspondence between TTO and Grogg in 2016 regarding TTO's "growth strategy" and pitch to potential investors. (*See* ECF No. 95.)

Production Runs.  It may have been aware that TTO intended to expand its business, seek investor funding, and eventually sell the business, but it was not aware of the specific offer made by Oppenheimer because that offer did not exist.  Thus, it could not have reasonably foreseen that its breach of the MSA would result in termination of that offer.  Snackwerks's general knowledge of TTO's long-term business strategy does not suffice to make it liable for damages arising from the failure of a venture that was unknown to it at the time the parties entered into the MSA, and at the time that Snackwerks produced the allegedly defective product.  Thus, Snackwerks is not liable for legal fees that TTO incurred in connection with that transaction, or for the loss of proceeds from that transaction.  Those damages were not reasonably foreseeable to Snackwerks.

On the other hand, the Court agrees with TTO that the expected proceeds from the Oppenheimer transaction may be relevant as a measure of the value of TTO.  As part of its damages request, TTO seeks recovery for "[d]amaged brand reputation and consumer perception of product quality," as well as "[f]ull shut-down and dissolution of [TTO] and its business due to the overall financial impact of the national FDA recall."  (2d Am. Compl. ¶ 37.)  Harm to TTO's business reputation is arguably a foreseeable result of the alleged breach by Snackwerks.  If that harm, and the associated diminution in value of TTO, are recoverable as damages for breach of contract, then the expected proceeds from the Oppenheimer transaction may be relevant to measure that harm.

Accordingly, the Court will grant Snackwerks's motion for partial summary judgment.  The legal fees and loss of proceeds incurred by TTO from the Oppenheimer transaction and its termination are not recoverable.  At this stage, however, the Court will not prohibit Snackwerks from using the expected proceeds from that transaction as evidence to support its other damages claims.

## V. CONCLUSION

For the reasons herein, the Court will grant Snackwerks's motion to dismiss TTO's negligence claim as well as Snackwerks's motion for partial summary judgment on damages.

The Court will enter an order consistent with this Opinion.

Dated:  May 17, 2022                             /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 UNITED STATES DISTRICT JUDGE